No. 25-10624

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

TEXAS CAPITAL BANK,

Plaintiff-Appellant,

v.

GOVERNMENT NATIONAL MORTGAGE ASSOCIATION, UNITED
STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

Defendants-Appellees.

On Appeal from the United States District Court
for the Northern District of Texas
Case No. 2:23-cv-00156

## BRIEF FOR APPELLEES

*Of Counsel:*

DAVID C. WOLL, JR.
*General Counsel*

*U.S. Department of Housing and Urban
Development*

BRETT A. SCHUMATE
*Assistant Attorney General*

KIRK MANHARDT
KEVIN P. VANLANDINGHAM
SHANE HUANG
SAMUEL HOBBS
*Commercial Litigation Branch*
*Civil Division*
*U.S. Department of Justice*
*P.O. Box. 875, Ben Franklin Station*
*Washington, DC 20044*
*(202) 616-0341*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

### Appellant Texas Capital Bank

Christopher G. Michel
William A. Burck
QUINN EMANUEL URQUHART & SULLIVAN, LLP
1300 I Street NW, Suite 900
Washington, D.C. 20005

Nicholas J. Caluda
QUINN EMANUEL URQUHART & SULLIVAN, LLP
700 Louisiana Street, Suite 3900
Houston, TX 77002

Isaac Nesser
QUINN EMANUEL URQUHART & SULLIVAN, LLP
295 5th Avenue, 9th Floor
New York, New York 10016

Matthew R. Scheck
Jacob M. Bliss
QUINN EMANUEL URQUHART & SULLIVAN, LLP
300 West Sixth Street, Suite 2010
Austin, TX 78701

*(continued on next page)*

**Appellees Government National Mortgage Association, United States Department of Housing and Urban Development**

Kirk Manhardt
Kevin P. Vanlandingham
Shane Huang
Samuel Hobbs
U.S. DEPARTMENT OF JUSTICE
Commercial Litigation Branch
Civil Division
P.O. Box 875, Ben Franklin Station
Washington, DC 20044

Dated: December 1, 2025                    /s/ *Shane Huang*
                                           Shane Huang

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument in this case would be helpful for answering the Court's questions regarding Appellees' administration of the Home Equity Conversion Mortgage and the Home Equity Conversion Mortgage-Backed Securities Programs, and how those complex governmental programs relate to the statute, regulations, contracts, program stakeholders, and the property rights at issue.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ............................................................ i

STATEMENT REGARDING ORAL ARGUMENT ...................................................... iii

TABLE OF CONTENTS ......................................................................................... iv

TABLE OF AUTHORITIES .................................................................................... vi

INTRODUCTION ................................................................................................... 1

STATEMENT OF JURISDICTION .......................................................................... 2

STATEMENT OF THE ISSUES .............................................................................. 3

STATEMENT OF THE CASE .................................................................................. 3

      A.     Statutory Background ............................................................... 3

      B.     HMBS Program Background ..................................................... 5

      C.     Factual Background ................................................................. 7

      D.     District Court Proceedings ...................................................... 12

SUMMARY OF ARGUMENT ................................................................................. 14

STANDARD OF REVIEW ..................................................................................... 16

ARGUMENT ....................................................................................................... 17

I.     GNMA had Statutory and Contractual Authority to Extinguish RMF's Rights and Interests, Which Necessarily Extinguished TCB's Collateral. ......... 17

      A.     GNMA had Statutory Authority to Enter the Guaranty Agreement which Allowed GNMA to Extinguish RMF's Interests. ........................... 17

      B.     Congress Required that the Entire Mortgages Become Absolute Property of GNMA Upon Extinguishment. ............................................. 18

C.      RMF Granted to TCB Limited Interests that Remained at All Times "Subject to" Extinguishment in the Event of RMF's Default ............................................................................................................... 21

D.      TCB's Argument Regarding "Serious Constitutional Questions" Was Waived and Is Meritless. .................................................... 25

E.      TCB's Contention that GNMA Promised that TCB's Liens Would Survive Extinguishment Is Both Refuted by the Record and Legally Irrelevant ........................................................................................ 27

II.     The District Court Did Not Abuse its Discretion in Refusing to Consider TCB's Unpled Arbitrary and Capricious Claim and TCB Waived Any Opportunity to Pursue the Claim Now .................................................... 28

III.    TCB's Tortious Interference Claim Is Barred by Sovereign Immunity and Is Meritless. ................................................................................................. 35

A.      Sovereign Immunity Bars the Tortious Interference Claim. .................... 35

B.      GNMA's Federal Statutory Authority Preempts Any State Law That Would Impair Its Extinguishment Rights. ......................................... 36

C.      GNMA's Statutory And Contractual Authority To Extinguish Defeats TCB's Tort Claim On The Merits. ............................................. 37

CONCLUSION ................................................................................................ 39

CERTIFICATE OF SERVICE ........................................................................ 40

CERTIFICATE OF COMPLIANCE .............................................................. 41

# TABLE OF AUTHORITIES

**Cases**

*Brackeen v. Haaland*, 599 U.S. 255 (2023)..................................................................... 34

*Brackeen v. Haaland*, 994 F.3d 249 (5th Cir. 2021) ......................................................33

*Bruckner Truck Sales, Inc. v. Guzman*, 148 F.4th 341 (5th Cir. 2025)...............................17

*Bucy v. Pennymac Loan Servs., LLC*, Case No. 2:15-cv-2909, 2016 WL 5719804 (S.D. Ohio Sept. 30, 2016).......................................................................... 41

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) ...................................36

*Colony Ins. Co. v. Wright*, 16 F.4th 1186 (5th Cir. 2021).......................................................28

*Degollado v. Solis*, 617 F. Supp. 3d 668 (S.D. Tex. 2022) ...................................................33

*Edberg v. Laurel Canyon Ranch Architectural Rev. Comm.*, No. 04-10-00395CV, 2011 WL 541134 (Tex. App. Feb. 16, 2011) ........................................................ 42, 43

*Energy Coal S.P.A. v. CITGO Petroleum Corp.*, 836 F.3d 457 (5th Cir. 2016).............32, 36

*FAA v. Cooper*, 566 U.S. 284 (2012) ...............................................................................39

*Foman v. Davis*, 371 U.S. 178 (1962).............................................................................31

*Hernández-Montañez v. Fin. Oversight & Mgmt. Bd. For Puerto Rico (In re Fin. Oversight & Mgmt. Bd. For Puerto Rico)*, 58 F.4th 580 (1st Cir. 2023)............................35

*In re Reverse Mortgage Investment Trust Inc.*, Case No. 22-11225-MFW (Bankr. D. Del.) . 10

*In re Reverse Mortgage Investment Trust, Inc.*, Case No. 22-11225 (MFW), ECF # 170 (Bankr. D. Del. Dec. 8, 2022).................................................................. 12

*In re Reverse Mortgage Investment Trust, Inc.*, Case No. 22-11225 (MFW), ECF # 500 (Bankr. D. Del. Feb. 23, 2023).................................................................24

*Janvey v. GMAG, L.L.C.*, 98 F.4th 127 (5th Cir. 2024)....................................................18

*Jones v. Robinson Prop. Grp., LP*, 427 F.3d 987 (5th Cir. 2005).........................................35

*Kosak v. United States*, 465 U.S. 848 (1984) ...................................................... 3, 39

*LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383 (5th Cir. 2007) ............................. 28

*Life Partners Inc. v. United States*, 650 F.3d 1026 (5th Cir. 2011) ......................................... 2

*Maritel, Inc. v. Collins*, 422 F. Supp. 2d 188 (D.D.C. 2006) ................................................. 37

*Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368 (5th Cir. 2014) ..... 35

*Mayfield Smithson Enter. v. Com-Quip, Inc.*, 896 P.2d 1156 (N.M. 1995) ...................... 24, 25

*McKinney v. Irving Ind. Sch. Dist.*, 309 F.3d 308 (5th Cir. 2002) ......................................... 31

*McNeily v. United States*, 6 F.3d 343 (5th Cir. 1993) ........................................................... 40

*O'Donnell v. Elgin, J. & E. Ry. Co.*, 338 U.S. 384 (1949) ..................................................... 33

*Pac. Shores Subdivision, Cal. Water Dist. v. U.S. Army Corps of Eng'rs*, 448 F. Supp. 2d 1 (D.D.C. 2006) ..................................................................................................... 36, 38

*PGB Hanger, LLC v. United States*, 170 Fed. Cl. 473 (Fed. Cl. 2024) .............................. 29

*Pipkin v. Mortg. Creditcorp, Inc.*, 72 F.3d 138 (table), 1995 WL 747437 (10th Cir. Dec. 18, 1995) ..................................................................................................................... 41

*Sammons v. United States*, 860 F.3d 296 (5th Cir. 2017) ..................................................... 28

*Seven Cty. Infrastructure Coalition v. Eagle Cty., Colo.*, 605 U.S. 168, 179–80 (2025) .......... 34

*Ski River Devel., Inc. v. McCalla*, 167 S.W.3d 121 (Tex. App. 2005) ................................. 40

*St. Christopher Assocs., L.P. v. United States*, 511 F.3d 1376 (Fed. Cir. 2008) ................... 29

*Texas v. U.S. Env. Prot. Agency*, 156 F.4th 523 (5th Cir. 2025) ......................................... 18

*Texas v. United States*. 524 F. Supp. 3d 598 (S.D. Tex. 2021) ............................................. 33

*Truman v. United States*, 26 F.3d 592 (5th Cir. 1994) ..................................................... 3, 40

*United States ex rel. Willard v. Humana Health Plan of Tex., Inc.*, 336 F.3d 375 (5th Cir. 2003) ..................................................................................................................... 35

*United States v. Miller*, 145 S. Ct. 839 (2025) ........................................................ 39

*United States v. NBD Bank, N.A.*, 922 F. Supp. 1235 (E.D. Mich. 1996) ...........21, 22, 42

*United States v. Salerno*, 222 F. Supp. 664 (D. Nev. 1963) ................................... 25

*Williamson v. U.S. Dept. of Agriculture*, 815 F.2d 368 (5th Cir. 1987) ................................. 2

**Statutes**

12 U.S.C. § 1715z-20 .................................................................. 4, 5

12 U.S.C. § 1721 ...............................................................passim

2 U.S.C. § 1716 ............................................................................ 5

2 U.S.C. § 1717 ............................................................................ 4

28 U.S.C. § 1291 ......................................................................... 2

28 U.S.C. § 1331 ......................................................................... 2

28 U.S.C. § 1346 ..................................................................... 28

28 U.S.C. § 2680 ..................................................................3, 39, 40

5 U.S.C. § 706 ....................................................................... 13, 32

Housing and Community Development Act of 1987, Pub. L. No. 100-242, 101 Stat. 1815, 1908–12 (Feb. 5, 1988) ................................................... 4

Uniform Comm. Code § 9-203 .................................................23, 25

**Rules**

Fed. R. Civ. P. 10 .......................................................................28, 30

Fed. R. Civ. P. 15 .......................................................................29, 31

**Constitutional Provisions**

U.S. Const. Art. VI, cl. 2 ............................................................. 36

**Other Authorities**

Congressional Research Service, HUD's Reverse Mortgage Insurance Program: Home Equity Conversion Mortgages, R44128 (March 31, 2017) ........................................... 4

Wright & Miller, Federal Practice & Procedure § 1487 .................................................... 29

**INTRODUCTION**

When Reverse Mortgage Funding, LLC ("RMF"), an issuer of mortgage-backed securities guaranteed by the Government National Mortgage Association ("GNMA"), experienced a liquidity crisis in late 2022, RMF filed a Chapter 11 bankruptcy petition, and the stakeholders worked around the clock to attempt to salvage the situation. The U.S. Department of Housing and Urban Development ("HUD") and GNMA worked to protect investors in RMF-issued securities and the elderly homeowners who relied on RMF-serviced reverse mortgages against disruption. Although RMF had defaulted on its obligations under its Guaranty Agreement with GNMA, GNMA decided to forbear on its remedy of extinguishing RMF's rights and interests, to allow the stakeholders to negotiate a potential resolution to the crisis in which RMF's limited mortgage rights could be transferred to a successor. One key condition of GNMA's forbearance was that RMF, as debtor in possession, would fulfill its obligations to pay investors (also known as "holders") of RMF-issued and GNMA-guaranteed securities on time. The negotiations among the private stakeholders reached an impasse, and after 18 days of forbearance, with over $317 million in investor payments coming due, GNMA exercised its extinguishment rights and assumed control over RMF's mortgages and securities.

One stakeholder, Plaintiff-Appellant Texas Capital Bank ("TCB"), has brought this case complaining not of GNMA's action of extinguishment of RMF's interests, but of the downstream consequences to TCB that flowed from that event. Notably absent

from any of TCB's briefing is an allegation that GNMA did not have the right to extinguish RMF's interests in response to RMF's default. Nevertheless, the statute that authorized GNMA's action of extinguishing RMF's mortgage rights and interests, the GNMA contracts that created and defined such rights, and the private contracts that created and defined TCB's security interests in RMF's mortgage rights and interests make clear: the extinguishment of RMF's rights inevitably destroyed TCB's own interests in that collateral. The district court correctly held that GNMA acted lawfully and that TCB's claims in this case are meritless.

## STATEMENT OF JURISDICTION

Count I of the Complaint, alleging violation of the Administrative Procedure Act, arose under federal law and was therefore within the District Court's jurisdiction under 28 U.S.C. § 1331. This Court has jurisdiction to hear an appeal from the District Court's judgment under 28 U.S.C. § 1291.

The District Court lacked jurisdiction over Count II of the Complaint, alleging promissory estoppel, because the United States has not waived sovereign immunity for promissory estoppel claims. *Life Partners Inc. v. United States*, 650 F.3d 1026, 1031 (5th Cir. 2011); *Williamson v. U.S. Dept. of Agriculture*, 815 F.2d 368, 378 (5th Cir. 1987).

As set forth in greater detail below, the District Court lacked jurisdiction over Count III of the Complaint, alleging tortious interference with property, because the United States has not waived sovereign immunity for state law tortious interference claims. 28 U.S.C. § 2680 (explicitly excepting "interference with contract rights" from

2

the waiver of sovereign immunity over tort claims); *Kosak v. United States*, 465 U.S. 848, 852 (1984). The property rights at issue are contractually granted liens on contractual rights, so "the underlying governmental conduct 'essential' to [TCB's] claim can fairly be read to 'arise out of' conduct that would establish an excepted cause of action." *Truman v. United States*, 26 F.3d 592, 594 (5th Cir. 1994); *see also infra* Argument Part III.A.

## STATEMENT OF THE ISSUES

1.  Whether GNMA acted within its authority under 12 U.S.C. § 1721(g)(1) when it extinguished RMF's mortgage rights that served as collateral for TCB's loans to RMF.

2.  Whether state tort law can limit the manner in which GNMA exercises extinguishment powers authorized by federal statute.

3.  Whether the district court abused its discretion in concluding that TCB failed to plead any arbitrary and capricious claim under the Administrative Procedure Act.

4.  Whether TCB otherwise waived its opportunity to pursue the arbitrary and capricious claim by not seeking to amend its complaint.

## STATEMENT OF THE CASE

### A.    Statutory Background

GNMA is a government-owned association within the Department of Housing and Urban Development, tasked by Congress with expanding affordable housing by

guaranteeing securities backed by federally insured or guaranteed mortgages. 12 U.S.C. § 1717(b)(1). In 1998, Congress authorized HUD to make permanent[1] the Home Equity Conversion Mortgage ("HECM") program "to meet the special needs of elderly homeowners" by allowing these homeowners to convert "a portion of accumulated home equity into liquid assets." 12 U.S.C. § 1715z-20(a)(1). The statute also instructs HUD to incentivize private sector lenders to participate in the HECM program. *Id.* at § 1715z-20(a)(2). The HECMs authorized under this program are commonly known as "reverse mortgages." *See, e.g.*, Congressional Research Service, HUD's Reverse Mortgage Insurance Program: Home Equity Conversion Mortgages, R44128 (March 31, 2017), *available at* https://www.congress.gov/crs_external_products/R/PDF/R44128/R44128.3.pdf.

Following its statutory mandate to ensure access to "private capital to the maximum extent feasible" for reverse mortgages, GNMA created the Home Equity Conversion Mortgage-Backed Securities ("HMBS") program, whereby GNMA executes agreements to guarantee HMBS securities under its statutory authority. 12 U.S.C. § 1716. The statute explicitly allows GNMA to extinguish all of an HMBS issuer's rights and interests if it defaults on any obligation:

---

[1] Between 1988 and 1998, the Home Equity Conversion Mortgage program was a "Demonstration Program" authorized on a temporary basis. *See* Housing and Community Development Act of 1987, Pub. L. No. 100-242, 101 Stat. 1815, 1908–12 (Feb. 5, 1988) (creating Section 255 of the National Housing Act, codified at 12 U.S.C. § 1715z-20).

[GNMA] is hereby empowered, in connection with any guaranty under this subsection, whether before or after any default, to provide by contract with the issuer for the extinguishment, upon default by the issuer, of any redemption, equitable, legal, or other right, title, or interest of the issuer in any mortgage or mortgages constituting the trust or pool against which the guaranteed securities are issued; and with respect to any issue of guaranteed securities, in the event of default and pursuant otherwise to the terms of the contract, the mortgages that constitute such trust or pool shall become the absolute property of the Association subject only to the unsatisfied rights of the holders of the securities based on and backed by such trust or pool. No State or local law, and no Federal law (except Federal law enacted expressly in limitation of this subsection after October 8, 1980), shall preclude or limit the exercise by the Association of (A) its power to contract with the issuer on the terms stated in the preceding sentence, (B) its rights to enforce any such contract with the issuer, or (C) its ownership rights, as provided in the preceding sentence, in the mortgages constituting the trust or pool against which the guaranteed securities are issued.

12 U.S.C. § 1721(g)(1).

## B.    HMBS Program Background

With this Congressionally granted authority, GNMA administers the HMBS program by entering into a standard "Guaranty Agreement" with a private HMBS "Issuer" who desires to issue GNMA-guaranteed HMBSs. Under the Guaranty Agreement, the Issuer conveys to GNMA all "right, title and interest" to the underlying reverse mortgages. ROA.1017. GNMA then transfers certain rights, including the right to repayment from the homeowner, back to the Issuer subject to GNMA's right to extinguishment in the event of the Issuer's default. ROA.1019–20. The Issuer also agrees to be bound by the terms of the Guaranty Agreement, which incorporates the statute, regulations, and GNMA's comprehensive published guide regarding mortgage-

backed securities (the "MBS Guide"). ROA.1015. In exchange, the Issuer is authorized to securitize reverse mortgages into GNMA-guaranteed HMBSs by issuing new securities backed by a pool of HECMs. ROA.1016–17. Each portion of a HECM loan balance included in an HMBS is known as a "Participation." ROA.873, 986–87, 991.

Unlike with traditional "forward" mortgages, in which homeowners borrow a lump sum when the mortgage is created and pay down the balance and accruing interest over time, HECMs are "reverse" mortgages through which a homeowner's mortgage balance owed to a lender increases as the borrower draws funds, interest accrues, and mortgage servicers pay property taxes and insurance premiums. *See* ROA.18. Because these balance-increasing events can happen after securitization, at any given moment, a reverse mortgage may include both amounts that have already been securitized, and later accrued amounts that have not yet been securitized—i.e., do not yet back any issued securities. *See* ROA.2057. In its brief, TCB describes the unsecuritized balances of reverse mortgages as "tails." TCB Br. 5. These unsecuritized portions can be securitized into new securities and sold to HMBS investors in a new "Participation" distinct from previous Participations associated with that mortgage. ROA.991. One reverse mortgage, governed by a single indivisible note, may therefore have different portions representing multiple distinct Participations and HMBSs, and portions not securitized at all. *See* ROA.991.

## C.    Factual Background

Before its bankruptcy and insolvency, RMF entered a Guaranty Agreement with GNMA to issue HMBSs. RMF, like all HMBS Issuers, agreed to transfer absolute title, rights, and interest in the reverse mortgages to GNMA, including future balances described by TCB as "tails":

> Section 3.01 The Issuer does hereby transfer, assign, set over, and otherwise convey to Ginnie Mae all the right, title, and interest of the Issuer in and to the (i) Mortgages and the related Participations identified and described in the Schedule of Pooled Participations and Mortgages for the subject pool of related Participations, (ii) with respect to each Mortgage, *all advances made before, on, or after the Effective Date* for principal payments to or on behalf of the mortgagor, and (iii) all servicing fees, MIPs, and interest accruals *before, on, or after the Effective Date*, in each case, to the extent not otherwise transferred or conveyed to Ginnie Mae pursuant to any other guaranty agreements substantially in the form of this Agreement. Such transfer and assignment shall be effective as of the date and time of delivery (release) of the Securities by Ginnie Mae or its agent, and shall include all interest, principal and other payments made on or with respect to, or related in any way to, such Mortgages. *This includes, but is not limited to, payments made to, on behalf of, or by the mortgagors in respect of the Mortgages after the Effective Date of the Securities* and all unscheduled recoveries of principal received on the Mortgages after the close of business on the Effective Date.

ROA.1017 (emphasis added).

In exchange, GNMA transferred back to RMF certain mortgage rights, subject to GNMA's right of extinguishment under 12 U.S.C. § 1721(g)(1):

> Section 10.04 On the occurrence or development of any event of default, unless arrangements under section 10.03 above are mutually agreed upon by and between Ginnie Mae and the Issuer and placed in written contractual form duly executed by Ginnie Mae, Ginnie Mae may, by letter directed to the Issuer, pursuant to section 306(g) of the National Housing Act [12 U.S.C. § 1721(g)], automatically effect and complete the

extinguishment of any redemption, equitable, legal, or other right, title, or interest of the Issuer in the Mortgages, the related Ginnie Participations and any Other Interests. The Mortgages and the related Ginnie Participations and the Other Interests, together with all accounts, books and all other hard copy or electronic records related to the Mortgages, the Ginnie Participations, the Other Interests or the Securities, automatically shall become the absolute property of Ginnie Mae, subject only to unsatisfied rights of the Security Holders. Upon such extinguishment, the Issuer automatically forfeits, waives and releases any and all rights to seek recovery of or reimbursement for any property or monies related in any way to the Mortgages, the related Ginnie Participations and any Other Interests *(including but not limited to undisbursed Mortgage proceeds or Advances that the Issuer made or makes)* that the Issuer might otherwise have recovered from any person or entity.

ROA.1027 (emphasis added); *see also* ROA.1027–28 (Guaranty Agreement Sections 10.05, 10.06). The MBS Guide further described the consequences of an extinguishment as a forfeiture and waiver of "any and all rights to reimbursement or recovery of any of its own funds, . . . even if such amounts have not been pooled in an HMBS security." ROA.990.

Under the terms of the Guaranty Agreement, RMF was required to fund borrower draws and other mortgage-related payments. ROA.1019. Those payments would, in turn, increase the mortgage balances owed by the homeowners to RMF. TCB Br. 5 (citing ROA.2057, 3515). As an Issuer, RMF would then securitize those newly created portions of the reverse mortgage balances in new HMBSs. RMF sold the new HMBSs to investors, thereby raising funds needed to cover upcoming borrower draws and other ongoing mortgage-related payments, as well as its own business operations. In the interim period, between paying for borrower draws and raising funds through

8

issuance and sale of securities to HMBS investors, RMF accessed liquidity by borrowing from its own lenders, such as TCB, by pledging its limited interests in the reverse mortgages as collateral for those loans. *See* ROA.2051–2105. To secure loans from TCB, RMF pledged its interests in the unsecuritized balances of the reverse mortgages, *i.e.*, the "tails," as collateral. ROA.2065–66. In accepting RMF's pledge of its "Tail" interests, TCB acknowledged in its "Tail Agreement" with RMF that the collateral remained "subject to the rights and interests of Ginnie Mae under the [MBS] Guide." ROA.2066.

In late 2022, RMF's financial condition worsened, and on November 30, 2022, RMF and its affiliates filed a Chapter 11 petition in the Bankruptcy Court for the District of Delaware. *See In re Reverse Mortgage Investment Trust Inc.*, Case No. 22-11225-MFW (Bankr. D. Del.). On December 2, 2022, RMF failed to obtain bankruptcy court approval to fund borrower draws, and GNMA notified RMF that RMF was in default under the Guaranty Agreement. ROA.1260. GNMA also informed RMF that GNMA would forbear from immediate extinguishment of RMF's rights, so long as certain conditions continued to be met, to give RMF and the other stakeholders in the RMF bankruptcy case an opportunity to transfer RMF's reverse mortgage and HMBS operations to another GNMA-approved issuer in an orderly manner. ROA.1260–63.

RMF, as debtor in possession, coordinated multilateral negotiations among its multiple stakeholders and obtained financing to fund its operations and to attempt an orderly transfer of its reverse mortgages and HMBS portfolios to a successor. The

9

United States, representing its agency GNMA, agreed not to object to the financing under the condition that the court order approving the financing contain a "United States Reservation of Rights," stating that nothing in the order would "modify, impair, or affect" any of GNMA's rights. *See* ROA.1306–07, 1310–11 (counsel for United States requesting that the "United States' Reservation of Rights" be included in any proposed order submitted to the bankruptcy court). RMF and TCB agreed, and on December 9, 2022, the bankruptcy court adopted the United States Reservation of Rights in an interim order authorizing RMF to obtain post-petition financing:

> Notwithstanding anything to the contrary in this Second Interim DIP Order or the DIP Loan Documents, nothing in this Second Interim DIP Order or the DIP Loan Documents shall:
>
> (a) modify, impair or affect any contract, guaranty agreement, escrow agreement, cross default agreement, FHA insurance contract, HECM second mortgage lien, FHA indemnification agreement, mortgage servicing rights associated with mortgages or participations that are backed or are otherwise associated with securities guaranteed by GNMA, the GNMA Guide, MBS prospectus documents, unilateral notification, notices of violation, supplements, addendums, amendments, and related documents or agreements, authorizations or writings (collectively the "HUD Agreements") between, either individually or together, the (a) the Debtors (including Debtor RMF; (b) Leadenhall; and/or (c) Longbridge (collectively, the " Potential Transfer Parties") and (y) GNMA and/or (z) the FHA (GNMA, together with FHA, "HUD"), including but not limited to that certain Acknowledgment Agreement dated May 8, 2019 between and among RMF, Leadenhall and GNMA, and in the event there is any conflict between this Second Interim DIP Order and the DIP Loan Documents, on the one hand, and any HUD Agreement on the other hand, the HUD Agreement shall control;
>
> ( . . . )

10

(c) subordinate, prime, authorize or grant any lien or security interest (including any Replacement Liens) or otherwise impair HUD's interest in, or rights to, (a) any escrow or custodial account, and all funds therein, held for the benefit of borrowers with FHA-insured mortgages, or otherwise affect mortgages or participations (as defined in the "HUD Agreements"); (b) the mortgages or participations backing or otherwise associated with GNMA guaranteed securities (c) any related collateral, including, but not limited to, cash, FHA mortgage insurance payments, accounts or collateral held or required to be held by the Debtors or any non-Debtor affiliates, GNMA, or any other party in connection with HUD Agreements;

*In re Reverse Mortgage Investment Trust, Inc.*, Case No. 22-11225 (MFW), ECF # 170, at

¶ 53 (Bankr. D. Del. Dec. 8, 2022) (reproduced at ROA.3358–59).

Throughout the negotiations relating to RMF's bankruptcy case, TCB repeatedly sought assurances from GNMA that it would be able to recover from the value of RMF's interests even if GNMA were to extinguish RMF's rights and interests. ROA.1321–23 (requesting from GNMA assurance of payment in the event that the tails are not securitized, as a "closing condition on TCB's funding and something we need today"). But GNMA expressly and repeatedly denied TCB's requests for such assurances. ROA.1338 (email GNMA saying "we have communicated our inability to agree to [TCB's request] due to limits in our authority"); ROA.1378 (formally informing RMF and TCB in a signed letter that GNMA "cannot make this commitment"). TCB nevertheless extended RMF a loan, secured by RMF's own interests, and thereby assumed the risk that its collateral interest in RMF's assets would be extinguished in the event of RMF's default. ROA.3358–59.

The negotiations to transfer RMF's portfolio to a successor were unsuccessful. By December 19, 2022, it became clear that RMF would be unable to fulfill the conditions of GNMA's forbearance, including the ability to make over $317 million[2] in payments due to HMBS investors on December 20, 2022.[3] With payments to the underlying homeowners and securities investors in jeopardy, GNMA gave RMF notice of immediate termination as an approved Issuer and extinguishment of all of its rights and interests in the mortgages. ROA.1700–03. GNMA thereafter assumed responsibility for all required payments on the reverse mortgages and HMBS.

### D.     District Court Proceedings

On October 4, 2023, TCB filed a three-count complaint in the district court. In its first count, TCB alleged that GNMA's actions in extinguishing RMF's interests exceeded GNMA's statutory authority or was "contrary to constitutional right" and should therefore be set aside under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2). ROA.33–34. In the second count, TCB further asserted a promissory estoppel claim. ROA.34. Finally, in its third count, TCB asserted a state law cause of action, alleging that GNMA's actions tortiously interfered with its property rights. ROA.35.

---

[2] *See* ROA.1214 (listing a scheduled draft of over $319 million, over $317 million of which was attributable to principal and interest payments on HMBSs).

[3] Other stakeholders acknowledged that RMF would be unable to meet the conditions of forbearance. For example, Leadenhall Capital Partners LLP, another of RMF's secured lenders, gave GNMA notice on December 19, 2022 that it was abandoning its liens on RMF's mortgage servicing rights. ROA.1694–97.

The United States filed a motion to dismiss, arguing that the APA count was meritless because GNMA acted within its express statutory authority, that TCB's promissory estoppel count was barred by sovereign immunity, and that TCB's tortious interference count was barred by sovereign immunity and otherwise meritless because GNMA had the legal right to take the actions it did. ROA.144–75. In its opposition, TCB belatedly raised—for the first time—an argument that its APA count was actually two separate counts, including an "arbitrary and capricious" claim based on facts pled as part of its promissory estoppel count. ROA.573–75. The district court granted GNMA's motion to dismiss in part, dismissing the promissory estoppel count, and declining to construe the complaint as alleging an "arbitrary and capricious" claim. ROA.745–46.[4] The district court otherwise denied the motion to dismiss with respect to Count One, which alleged that GNMA exceeded its statutory authority under the APA, and Count Three, which alleged tortious interference with property. ROA.740–42, 746–48. The district court held that "factual disputes on critical questions, from the nature of TCB's property interests to the commitments exchanged by the parties," precluded dismissal on the pleadings, ROA.741, based on the complaint's assertion that the "tails" at issue were not "mortgages," ROA.742, and that GNMA may have consented to RMF's transfer of rights to TCB. ROA.744.

---

[4] TCB did not move for reconsideration, or file a motion to amend its complaint to explicitly include an "arbitrary and capricious" claim. *See generally* ROA.1–12.

After GNMA filed its administrative record, TCB moved for partial summary judgment on Count One, the APA count. ROA.1970–72. The district court, with the benefit of an administrative record, examined the underlying contracts, relationships, and property at issue, and concluded that GNMA acted within its statutory authority, and that GNMA's extinguishment of RMF's interests necessarily extinguished any remaining derivative interest that TCB had in the underlying reverse mortgages. ROA.3027–32. The United States subsequently filed a motion for summary judgment. ROA.3044–46. The district court granted the United States' motion, holding again that GNMA acted within its statutory authority, and holding further that GNMA's statutory and contractual authority defeated Count Three, the tortious interference count. ROA 4153–60. The district court then entered judgment in favor of GNMA.ROA.4161.

## SUMMARY OF ARGUMENT

At all times, GNMA acted within its statutory authority and contractual rights. In 12 U.S.C. § 1721(g)(1), Congress empowered GNMA to execute contracts allowing GNMA to extinguish the mortgage rights and interests of issuers like RMF. In doing so, Congress provided that, upon extinguishment, the mortgages "shall become the absolute property" of GNMA. Under that authority, GNMA entered a Guaranty Agreement with RMF, taking all right, title, and interest of RMF in its mortgages, and granting back to RMF certain limited mortgage rights subject to extinguishment. Later, RMF pledged certain of its limited mortgage rights to TCB in exchange for loans. And both RMF and TCB acknowledged at all times that all of the mortgage rights would

14

remain subject to GNMA's extinguishment powers if RMF defaulted on the Guaranty Agreement. When RMF defaulted, GNMA exercised its extinguishment power to protect the interests of elderly homeowners and HMBS investors.

The consequences of GNMA's extinguishment flow readily from the statutory text and the nature of the limited mortgage rights at issue: RMF's rights and interests were extinguished, and any liens on those interests were similarly destroyed. The statute makes clear that the mortgages, in their entirety, become the "absolute property" of GNMA, and that interpretation is consistent with the nature of the mortgage rights being intertwined, and consistent with TCB's own acknowledgments in its dealings with RMF both before and during RMF's bankruptcy.

TCB's "arbitrary and capricious" arguments fare no better. First, TCB failed to plead an "arbitrary and capricious" APA claim in its complaint, and did nothing to amend the complaint in the months after the district court made clear that the complaint had not pleaded an "arbitrary and capricious" claim. Acting on reliance on the district court's ruling and TCB's acquiescence to the ruling, GNMA filed an administrative record relevant to the "contrary to law" APA claim and litigated two rounds of summary judgment briefings focused entirely on the "contrary to law" APA claim. It is too late for TCB to amend its complaint on appeal. At any rate, an amendment to add an "arbitrary and capricious" claim would be futile, because the record demonstrates that GNMA exercised explicit contractual and statutory authority, acknowledged by

15

TCB and the bankruptcy court, refuting any notion that GNMA acted in an "arbitrary and capricious" manner.

TCB's claim that GNMA's extinguishment constitutes tortious interference under state law fails because Congress expressly preempted any state or local law limiting GNMA's extinguishment powers. Congress also has not waived the United States' sovereign immunity for tortious interference with contract claims. TCB attempt to plead around this lack of any waiver of sovereign immunity by styling its claim as tortious interference with "property." But that framing does not change the essential nature of the claim, which is based on the elimination of TCB's contracted-for collateral rights. On the merits, GNMA had statutory and contractual authority to take the actions it did, preventing TCB from demonstrating the required showing for any tortious interference claim. For these reasons, the Court should affirm the district court's judgment.

## STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment de novo and applies the APA's standard of review to agency actions challenged under the APA. *E.g., Bruckner Truck Sales, Inc. v. Guzman*, 148 F.4th 341, 344 (5th Cir. 2025). Under the APA, this Court reviews issues of statutory interpretation de novo. *See, e.g., Texas v. U.S. Env. Prot. Agency*, 156 F.4th 523, 536 (5th Cir. 2025).

The Court reviews a district court's denial of leave to amend the pleadings for abuse of discretion. *Janvey v. GMAG, L.L.C.*, 98 F.4th 127, 133 (5th Cir. 2024).

16

## ARGUMENT

**I.    GNMA had Statutory and Contractual Authority to Extinguish RMF's Rights and Interests, Which Necessarily Extinguished TCB's Collateral.**

**A.    GNMA had Statutory Authority to Enter the Guaranty Agreement which Allowed GNMA to Extinguish RMF's Interests.**

GNMA had statutory and contractual authority to extinguish RMF's rights and interests, and its exercise of that authority had the consequence of extinguishing the collateral to which TCB's liens attached. Congress granted GNMA the power to enter contracts that provide for extinguishment of an issuer's rights and interests upon the Issuer's default:

> [GNMA] is hereby empowered, in connection with any guaranty under this subsection, whether before or after any default, to provide by contract with the issuer for the extinguishment, upon default by the issuer, of any redemption, equitable, legal, or other right, title, or interest of the issuer in any mortgage or mortgages constituting the trust or pool against which the guaranteed securities are issued.

12 U.S.C. § 1721(g)(1). Under that authority, GNMA entered its standard Guaranty Agreement with RMF, and through that Guaranty Agreement RMF conveyed all mortgage rights and interests, including its interests in any future unsecuritized balances, to GNMA. ROA.1017. The Guaranty Agreement expressly provides that upon RMF's default that GNMA could, by letter, "automatically effect and complete the extinguishment of any redemption, equitable, legal, or other right, title, or interest of the Issuer in the Mortgages, the related Ginnie Participations and any Other Interests." ROA.1027; *see also* ROA.1027–28 (further describing consequences of extinguishment

17

in Sections 10.05, 10.06). The Guaranty Agreement explicitly defined the interests at issue to include future advances or payments to be made by the issuer "after the Effective Date of the Securities" or any "Other Interests" not already securitized in "Ginnie Participations"—in other words, the portions of the mortgages that TCB refers to as "tails." ROA.1017, 1027. Further, the MBS Guide, which was incorporated by the Guaranty Agreement, ROA.1015, and acknowledged by TCB's Tail Agreement, ROA.2066, explicitly provides for extinguishment of RMF's rights and interests "even if such amounts have not been pooled in an HMBS security." ROA.990. RMF's interests in the mortgages, including "tails," were therefore completely and entirely subject to GNMA's right to extinguish as a remedy for RMF's default.

### B. Congress Required that the Entire Mortgages Become Absolute Property of GNMA Upon Extinguishment.

TCB argues that the statutory phrase "mortgages constituting the trust or pool" includes only the securitized portions of mortgages that have been partially securitized. TCB Br. 29–31. The statutory text and history proves Congress intended for GNMA to take the entire mortgages upon extinguishment.

Starting with the plain text of the statute, Congress provided that

> in the event of default and pursuant otherwise to the terms of the contract, the mortgages that constitute such trust or pool shall become the absolute property of the Association subject only to the unsatisfied rights of the holders of the securities based on and backed by such trust or pool.

12 U.S.C. § 1721(g)(1). First, the statute refers to "mortgages," not parts of mortgages. *See* ROA.3031 (district court holding that the statute does not "split" the mortgages

18

"into smaller parts" or distinguish between securitized or unsecuritized portions). Second, the statute describes the effect of extinguishment as becoming "the absolute property of [GNMA] subject only to the unsatisfied rights of the holders of the securities based on and backed by such trust or pool." 12 U.S.C. § 1721(g)(1). Under this text, GNMA's absolute right to the mortgages is subject only to unsatisfied claims of the HMBS securities holders. The statute makes no allowance for TCB's lien against the RMF's interest in the mortgages.

Under TCB's erroneous understanding, upon extinguishment GNMA must not only service the mortgages and make decisions about pursuing remedies, including civil lawsuits and foreclosures, against defaulting borrowers, but must at the same time set aside a portion of any recovery for the benefit of the issuer's lenders, like TCB. *See* TCB Br. 31. TCB's position does not describe "<u>absolute</u> property," and would be inconsistent with the statutory text that GNMA's rights would be "subject <u>only</u> to" HMBS investors. The plain text of the statute therefore contradicts TCB's proposed construction. As the district court observed, TCB's interpretation would require the courts to read in additional language not actually present in the statute, in a manner inconsistent with the rest of the statute's text. ROA.3031.

Similarly, the nature of the mortgage rights confirms that the statute grants GNMA the power to assume absolute ownership of the entire mortgage, including securitized and unsecuritized balances. The entire bundle of mortgage rights includes more than simple rights to payment. The mortgage rights include the rights and

obligation to service the mortgages, to hold funds in escrow for property taxes and insurance, and account for cash flows, only a portion of which are owed to investors holding the securities. *See United States v. NBD Bank, N.A.*, 922 F. Supp. 1235, 1247 (E.D. Mich. 1996) (analyzing how GNMA's responsibility to service the entire mortgages logically extended to fit with ownership over all rights to payment). In the event of an issuer's default, Congress plainly intended for GNMA to step in to assume all rights and responsibilities for the mortgage to ensure the homeowner-borrowers and security holders continue to receive payment.

TCB argues that *NBD Bank* is not applicable to this case because *NBD Bank* was decided before the HMBS program was created, and involved forward mortgages that do not have "tails." TCB Br. 32 n.3. The statutory text of 12 U.S.C. § 1721(g)(1), however, has not changed since *NBD Bank* was decided. *See* 12 U.S.C. § 1721(g)(1) (1988) (reproduced at ROA.4133). And regardless of whether forward mortgages have "tails," the forward mortgages at issue in *NBD Bank* had both securitized portions backing GNMA-guaranteed securities and unsecuritized portions that did not back any GNMA guaranty. *NBD Bank, N.A.*, 922 F. Supp. at 1247 (noting that although the funds in dispute in that case were not securitized and were not funded by GNMA, GNMA's absolute ownership of the entire mortgages extended to those portions funded by others and not backing any GNMA-guaranteed security). The same is true here. As confirmed in *NBD Bank*, Congress did not distinguish any partial interests in

the mortgage and instead authorized GNMA to take the entire mortgage upon the issuer's default.

TCB's narrow focus on whether any particular portion of a mortgage balance backs a GNMA-guaranteed security also defies logic. TCB funded one month's worth of payments in December 2022, and now seeks a lien over all unsecuritized portions of the mortgages, including the unsecuritized balances arising out of 35 months (and counting) of payments funded directly by GNMA since RMF's extinguishment. The statute contemplates absolute ownership over the entire mortgages because the entire mortgages have inextricably intertwined rights and responsibilities. Upon default, Congress authorized GNMA to take absolute ownership for all intertwined mortgage rights.

### C.     RMF Granted to TCB Limited Interests that Remained at All Times "Subject to" Extinguishment in the Event of RMF's Default

When RMF pledged the "tails" to TCB as security for loans, TCB explicitly acknowledged GNMA's superior right of extinguishment. In the Tail Agreement between RMF and TCB, TCB acknowledged that RMF's pledged collateral remained "subject to the rights and interests of Ginnie Mae." ROA.2066. TCB's Tail Agreement acknowledges a foundational legal principle of commercial law, that RMF could not grant to TCB a greater interest in the mortgages than held by RMF itself. ROA.3028 ("Of course, RMF could not grant to TCB a greater interest in the Tails than the interest it held."); *see also* Uniform Comm. Code § 9-203 cmt. 6 ("[I]n accordance with basic

21

personal property conveyancing principles, the baseline rule is that a security interest attaches only to whatever rights a debtor may have, broad or limited as those rights may be."). Thus, because GNMA maintained a right to extinguish all RMF's interests, RMF had no ability to strip GNMA's extinguishment rights over entire mortgages by conveying certain rights to a portion of those mortgages to another party. Similarly, the orders of the bankruptcy court could not and did not expand the scope of RMF's property interests, but merely authorized RMF to pledge the interests it had to secure funding from TCB. Nothing in the bankruptcy court orders purports to exempt TCB from the effects of extinguishment, or otherwise impair GNMA's extinguishment powers. ROA.3358–59; *see also In re Reverse Mortgage Investment Trust, Inc.*, Case No. 22-11225 (MFW), ECF # 500, at 72–75 (Bankr. D. Del. Feb. 23, 2023) (preserving the United States' Reservation of Rights in a later "final order" modifying the interim order in effect in December 2022). The orders instead explicitly disclaim any limitation on GNMA's rights.

When RMF pledged the tails to TCB as collateral for its loan, those tails thus remained subject to GNMA's extinguishment authority. And when GNMA then extinguished RMF's rights and interests, TCB's derivative liens could not survive extinguishment of the underlying collateral. ROA.3028–30. In this way, TCB's position is analogous to a lender accepting a lien on a leasehold in real property from a tenant. If the landlord subsequently terminates the lease in response to the tenant's breach of the lease agreement, the lender's lien does not survive the termination of the lease. *See,*

22

*e.g.*, *Mayfield Smithson Enter. v. Com-Quip, Inc.*, 896 P.2d 1156, 1161–62 (N.M. 1995) ("Because the bankruptcy court's rejection [of a lease] surrendered all property rights [of a tenant] to the [landlord], it logically follows that there was an extinguishment of the leasehold and any liens encumbering that leasehold. The extinction of the property against which a lien applies serves to extinguish the lien."). In the same way, TCB's lien on certain of RMF's limited mortgage rights could not survive the extinguishment of those rights. The statute is clear and unambiguous that the consequence of extinguishment is that the mortgages "shall become the absolute property" of GNMA. 12 U.S.C. § 1721(g)(1).

TCB's asserts that its liens constitute property interests distinct from RMF's own interest, TCB Br. 19–20. TCB's assertion fails for two reasons. *First*, as explained above, RMF had no ability to convey a greater interest to TCB than it had. RMF's interests in the reverse mortgages remained at all times subject to GNMA's extinguishment right, and thus TCB's lien on RMF's interests also remained subject to extinguishment. *Second*, TCB's liens ceased to exist upon extinguishment because they were attached to property—namely, RMF's mortgage rights and interests—that ceased to exist. It is black letter law that "a lien continues in existence only so long as the property charged continues in existence, and the lien dies with the destruction against which it is a charge." *Mayfield*, 896 P.2d at 1162 (quoting *United States v. Salerno*, 222 F. Supp. 664, 668–69 (D. Nev. 1963)); *see also, e.g.*, Uniform Comm. Code § 9-203 cmt. 6 ("[A] security interest attaches only to whatever rights a debtor may have, broad or limited as those

rights may be."). Therefore, it is immaterial whether TCB's liens constituted property distinct from RMF's collateral, as TCB argues, because TCB's liens were nevertheless entirely derivative of RMF's extinguished mortgage interests.

TCB then endeavors to create a right distinct from, and superior to RMF's extinguished interests by arguing that extinguishment constitutes a transfer of rights from RMF to GNMA, rather than the extinguishment of RMF's rights entirely—in effect arguing for elevation of TCB's subsequent lien against RMF over GNMA's preexisting rights. *See* TCB Br. 22–23. That argument is precluded by the statutory text. The plain text of the statute explicitly describes extinguishment as resulting in the mortgages "becom[ing] the absolute property of [GNMA]." 12 U.S.C. § 1721(g)(1). When TCB accepted RMF's mortgage interest as collateral, TCB acknowledged that its lien remained subject to this statutory limitation. ROA.2066. And nothing in the regulations, MBS Guide, or the agreements describes extinguishment as a transfer or contradicts that the mortgages become GNMA's absolute property upon extinguishment. *See generally* ROA.990, 1026–27.

TCB's observation that the bankruptcy court orders' United States Reservation of Rights do not mention TCB or tails, TCB Br. 9, 24, cuts *against* their position. The record shows clearly that RMF, as debtor in possession seeking to preserve some value for the benefit of RMF's estate and its creditors, was managing multilateral negotiations involving interests of multiple stakeholders: GNMA, FHA, TCB, multiple other secured creditors, multiple other lenders providing post-bankruptcy financing, the

24

potential successors who would take over the RMF portfolio, as well as the underlying mortgage borrowers, HMBS investors and other participants in the mortgage and reverse mortgage industries. *See, e.g.*, ROA.1285, 1290, 1293, 1316–17, 1321, 1332, 1338, 1457, 1471. Despite the myriad of interests in RMF's assets, the United States Reservation of Rights simply and broadly states that its interests remain unimpaired. Nothing in the reservation purports to subdivide or carveout any mortgage interest for different treatment, which evinces an intent not to provide TCB with any kind of special protection from the generally applicable effects of extinguishment.

### D.     TCB's Argument Regarding "Serious Constitutional Questions" Was Waived and Is Meritless.

TCB argues that the district court's construction of 12 U.S.C. § 1721(g)(1) raises constitutional issues under the Takings Clause and the Due Process Clause, TCB Br. 32–34, but TCB waived its argument by failing to raise it during the summary judgment stage, and its argument is meritless in any event. When TCB moved for partial summary judgment on its preferred statutory construction of 12 U.S.C. § 1721(g)(1), it raised no constitutional arguments in its initial motion or in its reply. *See generally* ROA.1975–87. 2989–3004. Similarly, when TCB opposed the United States' motion for summary judgment, it made no mention of constitutional avoidance, the Takings Clause, or the Due Process Clause. *See generally* ROA.3481–99. It is well established that "[a]rguments not raised before the district court are waived and cannot be raised for the first time on appeal." *Colony Ins. Co. v. Wright*, 16 F.4th 1186, 1189 n.1 (5th Cir. 2021) (quoting

25

*LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 387 (5th Cir. 2007)). Accordingly, TCB waived this constitutional avoidance argument by failing to raise it during either round of summary judgment briefing.

Even if this Court were to consider TCB's constitutional arguments, those arguments are meritless. It is well established that the district courts lack jurisdiction to hear claims under the Takings Clause for more than $10,000. *See* 28 U.S.C. § 1346(a)(2) (the so-called "Little Tucker Act" limiting the district courts' jurisdiction over constitutional claims for damages in excess of $10,000); *Sammons v. United States*, 860 F.3d 296, 299 (5th Cir. 2017) ("Under the Tucker Act, the [Court of Federal Claims] has exclusive jurisdiction over claims against the United States for more than $10,000"). TCB's Complaint alleged "more than $28 million" in controversy, well above the $10,000 threshold in the Little Tucker Act. ROA.27.

More fundamentally, TCB does not have a cognizable property interest in GNMA forbearing from its own statutorily and contractually authorized power of extinguishment in response to RMF's default. As discussed above, TCB acknowledged that the collateral securing its loans to RMF remained subject to GNMA's rights, including the right to extinguishment. ROA.2066. Whatever property rights TCB held in the mortgages was derivative of RMF's own rights under the Guaranty Agreement and the MBS Guide, and TCB therefore could have no additional property interest greater than RMF's own. *See supra* I.C; ROA.3028 ("Of course, RMF could not grant to TCB a greater interest in the Tails than the interest it held."). Just as RMF would not

26

have been able to assert a claim under the Takings Clause or Due Process Clause in its own rights under the Guaranty Agreement or the MBS Guide,[5] TCB's claim, entirely derivative of RMF's contractual rights under the Guaranty Agreement, would necessarily fail on the same basis.

### E.    TCB's Contention that GNMA Promised that TCB's Liens Would Survive Extinguishment Is Both Refuted by the Record and Legally Irrelevant.

Throughout its brief, TCB falsely states that GNMA induced TCB into lending funds to the RMF bankruptcy estate by providing assurances that TCB would be able to seek reimbursement from the value of the "tails," regardless of whether RMF could successfully transfer its portfolio to a successor. *See, e.g.*, TCB Br. 1, 8, 9. The undisputed record flatly contradicts TCB's representation. TCB's incorrect contention is, in any event, not relevant to any claim raised in this appeal.

Multiple times, TCB sought assurance from GNMA that TCB would be able to rely on the value of the "tails" for reimbursement upon extinguishment, or if RMF was otherwise unable to repay TCB in full. *See, e.g.*, ROA.1321–23. GNMA reiterated, in emails and formal letters, that it would not provide any such assurance, which lies outside the scope of GNMA's authority. ROA.1338 (email explaining GNMA's

---

[5] *Cf. St. Christopher Assocs., L.P. v. United States*, 511 F.3d 1376, 1385 (Fed. Cir. 2008) (observing that the government's valid exercise of its contractual rights rarely gives rise to a takings claim); *PGB Hanger, LLC v. United States*, 170 Fed. Cl. 473, 481 (Fed. Cl. 2024) (no takings claim is available when the property rights at issue were created by government contract).

"inability to agree . . . due to limits in our authority"); ROA.1378 (formal letter explaining that "Ginnie Mae cannot make this commitment" as requested by RMF and TCB). Even without receiving any of the assurances sought from GNMA, TCB nevertheless decided to extend financing to the RMF bankruptcy estate.

On this full record, the district court rejected TCB's contention that GNMA consented to transfer of unextinguishable liens from RMF to TCB. ROA.3029–30.

## II.　The District Court Did Not Abuse its Discretion in Refusing to Consider TCB's Unpled Arbitrary and Capricious Claim and TCB Waived Any Opportunity to Pursue the Claim Now.

TCB did not plead any "arbitrary and capricious" claim under the APA in its Complaint, and did not ask for an opportunity to amend its complaint after the district court ruled that the complaint had not alleged such a claim. The district court's decision to refuse to consider a claim not asserted within the Complaint was well within its discretion. *See* Fed. R. Civ. P. 10(b) (requiring separate counts for separate claims when "doing so would promote clarity"). Contrary to TCB's assertions, *see* TCB Br. 35, 37, the district court did not dismiss a claim asserted in the Complaint, but rather construed the complaint according to its own delineated counts and statutory quotations. And TCB's decision not to request an amendment below precludes it from pursuing the arbitrary and capricious claim now. Allowing TCB to advance its unpled arbitrary and capricious claim at this late stage would prejudice the Defendants. Moreover, permitting TCB to proceed on the theory would be futile, because the administrative record contradicts TCB's factual allegations in support of this theory.

28

When a plaintiff attempts to amend a complaint through an opposition to a Motion to Dismiss, the district court is within its discretion to deny such a request when the request fails to furnish a proposed amendment or otherwise alert the court to the substance of a proposed amendment. *See McKinney v. Irving Ind. Sch. Dist.*, 309 F.3d 308, 315 (5th Cir. 2002). Even when a motion for leave to amend a complaint follows the correct procedure under Fed. R. Civ. P. 15, amendment is improper when it would cause undue prejudice or would be futile. *See Foman v. Davis*, 371 U.S. 178, 182 (1962); Wright & Miller, Federal Practice & Procedure § 1487 (describing "prejudice" as "[p]erhaps the most important factor").

In its Complaint, TCB alleged GNMA acted "not in accordance with law" or "contrary to constitutional right" under the APA. ROA.33–34. Even when directly quoting 5 U.S.C. § 706(2) in paragraph 88 of its Complaint, TCB skipped over the statutory phrase "arbitrary and capricious" and replaced that statutory text with ellipses. *Compare* ROA.33 ¶ 88, *with* 5 U.S.C. § 706(2). During motion to dismiss briefing below, TCB asserted, for the first time, a claim that GNMA acted in an arbitrary and capricious manner. ROA.573–75 (arguing that GNMA acted arbitrarily and capriciously by extinguishing RMF's interests without explanation or acknowledgment of the effect on TCB and its "reliance interests"). In doing so, TCB asserted its "arbitrary and capricious" claim in its opposition to the United States' Motion to Dismiss rather than availing itself to its right to amend the Complaint "as a matter of course." Fed. R. Civ. P. 15(a)(1)(B). The District Court refused to consider the new arbitrary and capricious

29

claim, concluding that the "arbitrary and capricious" claim was distinct from the "contrary to law" claim and that TCB could not amend the pleadings in an opposition to a motion to dismiss. ROA.745 (citing *Energy Coal S.P.A. v. CITGO Petroleum Corp.*, 836 F.3d 457, 462 n.4 (5th Cir. 2016); *Texas v. United States.* 524 F. Supp. 3d 598, 632 (S.D. Tex. 2021)). That decision was well within the district court's authority and discretion to require that litigants clearly present the issues. *See* Fed. R. Civ. P. 10(b) ("If doing so would promote clarity, each claim founded on a separate transaction or occurrence--and each defense other than a denial--must be stated in a separate count or defense."); *Degollado v. Solis*, 617 F. Supp. 3d 668, 674 n.1 (S.D. Tex. 2022) (declining to construe an ambiguously pleaded complaint to allege claims not clearly stated); *cf. O'Donnell v. Elgin, J. & E. Ry. Co.*, 338 U.S. 384, 392–93 (1949) (observing the confusion that follows a plaintiff's framing of a pleaded count that consists of a "scrambling of [multiple] claims" and legal theories).

This Court has recognized that the APA "call[s] for courts to *separately* evaluate whether an agency action is arbitrary and capricious and whether an agency action is in excess of statutory authority." *Brackeen v. Haaland*, 994 F.3d 249, 355 (5th Cir. 2021), *aff'd in part, vacated in part, rev'd in part*, 599 U.S. 255, 143 S. Ct. 1609 (2023).[6] Moreover, the two types of APA claims call for distinct deference standards for judicial review. *See*

---

[6] In its review, the Supreme Court did not consider the APA issues presented in this Court. *See Brackeen v. Haaland*, 599 U.S. 255, 271 n.1 (2023) (noting that the APA issues considered by the Court of Appeals was not before the Supreme Court).

*Seven Cty. Infrastructure Coalition v. Eagle Cty., Colo.*, 605 U.S. 168, 179–80 (2025) (holding that judicial review of an agency's statutory interpretation is de novo, but an agency's exercise of discretion granted by statute is under a "deferential arbitrary-and-capricious standard"). The district court was therefore correct to note the difference between the "not in accordance with law" APA claim asserted in the complaint and the "arbitrary and capricious" claim asserted in TCB's briefing. *See* ROA.745.

Crucially, following the district court's order, TCB did not seek to amend its complaint under Fed. R. Civ. P. 15 to add an arbitrary and capricious claim, even though the scheduling order explicitly provided another five months to do so. ROA.451, 775, 3015. Moreover, months before the operative First Amended Scheduling Order's deadline for motions to amend pleadings by September 26, 2024, ROA.775, or motions for summary judgment by May 12, 2025, TCB filed an early Motion for Partial Summary Judgment on the APA Count on June 27, 2025. ROA 1970. TCB's acquiescence to the district court's ruling, with months of opportunity to move to amend, constitutes undue delay and waiver of any right to seek an amendment now. *See, e.g.*, *Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 378 (5th Cir. 2014) ("The district court is entrusted with the discretion to grant or deny a motion to amend and may consider a variety of factors including "undue delay, bad faith or dilatory motive on the part of the movant, repeated failures to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party . . . and futility of the amendment.") (quoting *Jones v. Robinson Prop. Grp., LP*, 427 F.3d 987, 994 (5th Cir. 2005)); *United States ex rel.*

31

*Willard v. Humana Health Plan of Tex., Inc.*, 336 F.3d 375, 387 (5th Cir. 2003) ("A party who neglects to ask the district court for leave to amend cannot expect to receive such a dispensation from the court of appeals."); *see also Hernández-Montañez v. Fin. Oversight & Mgmt. Bd. For Puerto Rico (In re Fin. Oversight & Mgmt. Bd. For Puerto Rico)*, 58 F.4th 580, 584–85 (1st Cir. 2023) (holding that failure to seek leave in the district court to amend the complaint forfeits the argument in the court of appeals); *Energy Coal*, 836 F.3d at 462 n.4 (holding that the court of appeals could not consider allegations asserted in a proposed amended complaint for which the motion to amend was withdrawn in the district court).

Allowing TCB to renew its previously abandoned pursuit of its unpled arbitrary and capricious claim at this stage would prejudice the Defendants. TCB's purported arbitrary and capricious claim largely concerns actions and communications *after* extinguishment. TCB Br. 40 (alleging an "abrupt change of position" on March 9, 2023, nearly three months after the extinguishment of December 20, 2023). As an initial matter, those post-decision facts are legally irrelevant. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) (holding that judicial review under 5 U.S.C. § 706 considers the "full administrative record that was before the [agency] *at the time [it] made [its] decision*") (emphasis added); *Pac. Shores Subdivision, Cal. Water Dist. v. U.S. Army Corps of Eng'rs*, 448 F. Supp. 2d 1, 4 (D.D.C. 2006) (interpreting "whole record" to include "all documents and materials that the agency 'directly or indirectly considered . . . [and nothing] more nor less'") (quoting *Maritel, Inc. v. Collins*, 422 F. Supp. 2d 188, 196

32

(D.D.C. 2006)). But if TCB were permitted to pursue the claim based on post-extinguishment facts, GNMA would have to assemble a new record to document those facts. Defendants would then have to engage in yet another round of summary judgment briefing, further delaying finality in this long-pending suit. The unwarranted delay, additional record-assembling, and subsequent briefing constitute sufficient prejudice to deny TCB's request to pursue its unpled theory, especially given that TCB offers no rationale to explain why it did not seek to amend the complaint in a timely fashion while the case remained pending within the district court's schedule for amendment of the pleadings.

In addition, amendment to add an arbitrary and capricious claim would be futile. The record shows that RMF defaulted on its Guaranty Agreement, that GNMA's 18-day forbearance gave the stakeholders opportunities to work around the clock to seek a solution to the crisis, and that GNMA extinguished RMF's interests at the last possible moment, only after RMF lacked sufficient funds to make payments to HMBS investors. ROA.1700–03. TCB does not allege that any of these actions were arbitrary and capricious, and challenges only GNMA's and the district court's interpretation of law, that extinguishment of RMF's interests eliminated TCB's interests in that extinguished collateral. *See generally* TCB Br. 37. TCB's arbitrary and capricious claim therefore relies on the meritless legal position that its liens could have survived RMF's extinguishment, and therefore must fail for the same reason as the "exceeds authority" claim. *See supra* Part I.

Otherwise, all that TCB's musters to support its arbitrary and capricious claim is to describe GNMA's communications as an "abrupt change of position." TCB Br. 39–40. But the record contradicts TCB's allegations and demonstrates that GNMA consistently and explicitly protected its extinguishment right, by, for instance, refusing TCB's multiple requests for assurance that TCB's collateral would survive extinguishment. ROA.1321–23 (email requesting that GNMA agree to cover unpaid amounts owed by RMF); ROA.1338 (email explaining GNMA's "inability to agree [to TCB's request] due to limits in our authority"); ROA.1378 (formal letter explaining that "Ginnie Mae cannot make this commitment" as requested by RMF and TCB) The alleged post-extinguishment communications are therefore consistent with the pre-extinguishment communications actually reflected in the record, and in any event the post-extinguishment communications are not legally relevant to the judicial review of GNMA's extinguishment action. *See, e.g.*, *Pac. Shores*, 448 F. Supp. 2d at 4 (explaining that the record on judicial review was "all documents and materials that the agency 'directly or indirectly considered . . . [and nothing] more nor less"). Amendment of the complaint to include allegations flatly contradicted by the documentary record would be futile.

### III. TCB's Tortious Interference Claim Is Barred by Sovereign Immunity and Is Meritless.

#### A. Sovereign Immunity Bars the Tortious Interference Claim.

Congress explicitly precluded plaintiffs from asserting tort claims against the United States for interference with a contract. TCB cannot evade that statutory bar through creative pleading.

The United States is immune from suit unless Congress unambiguously waives sovereign immunity by statute, and such waivers of sovereign immunity must be narrowly construed with any ambiguities resolved in favor of the sovereign. *E.g.*, *United States v. Miller*, 145 S. Ct. 839, 852 (2025) (quoting *FAA v. Cooper*, 566 U.S. 284, 291 (2012)). The Federal Tort Claims Act ("FTCA") waives sovereign immunity only for certain tort claims, and explicitly excludes from its waiver of sovereign immunity claims "arising out of . . . interference with contract rights." 28 U.S.C. § 2680; *see also Kosak v. United States*, 465 U.S. 848, 852 (1984) (describing section 2680 as containing exceptions to the FTCA's "broad waiver of sovereign immunity").

Regardless of the label placed on a claim by a plaintiff, federal courts lack jurisdiction to hear claims "when the underlying governmental conduct essential to the plaintiff's claim can fairly be read to arise out of conduct that would establish an excepted cause of action." *Truman v. United States*, 26 F.3d 592, 594 (5th Cir. 1994) (quoting *McNeily v. United States*, 6 F.3d 343, 347 (5th Cir. 1993)).

In this case, TCB alleged that GNMA's extinguishment constituted interference with TCB's right to payment, arising out of its contracts with RMF, secured by RMF's contractual rights with the HECM borrowers. Because the "property" at issue consists entirely of contractual rights, or security interests in contractual rights, TCB's tortious interference claim is essentially a claim for tortious interference with contract or with business expectancy, for which the FTCA does not waive sovereign immunity. 28 U.S.C. § 2680.

TCB's refence to Texas state law authorizing a cause of action for tortious interference with property does not alter the essential nature of its claim. Under Texas law, a claim for interference with economic property rights, such as the right to dispose of property, is "in essence, a claim for tortious interference with a prospective contract or prospective business relation." *Ski River Devel., Inc. v. McCalla*, 167 S.W.3d 121, 140 (Tex. App. 2005). The property rights at issue in this case are purely economic property rights, securing the right to payment. *See, e.g.*, ROA.21, 25. Thus, however framed, TCB's tortious interference claim in essence concerns alleged interference with contractual security rights—Congress explicitly refused to waive the United States' sovereign immunity for such claims.

## B. GNMA's Federal Statutory Authority Preempts Any State Law That Would Impair Its Extinguishment Rights.

Congress enacted a federal statute that empowered GNMA to extinguish issuer interests in mortgages, upon the issuer's default, which preempts any state law to the

contrary. *See* U.S. Const. Art. VI, cl. 2. Leaving no doubt, the federal statute explicitly provides that "[n]o State or local law . . . shall preclude or limit the exercise by [GNMA] of [] its power to contract with the issuer [regarding extinguishment] . . ., its rights to enforce any such contract with the issuer, or [] its ownership rights [regarding extinguishment] . . . in the mortgages . . . ." 12 U.S.C. § 1721(g)(1). As such, the federal statute preempts any state law duty impairing GNMA's ability to exercise its right to extinguishment under federal law. *See, e.g.*, *Pipkin v. Mortg. Creditcorp, Inc.*, 72 F.3d 138 (table), 1995 WL 747437, at *3 (10th Cir. Dec. 18, 1995) (holding that GNMA was not required to follow Texas law on recording mortgages) (unpublished); *Bucy v. Pennymac Loan Servs., LLC*, Case No. 2:15-cv-2909, 2016 WL 5719804, at *12–13 (S.D. Ohio Sept. 30, 2016) (holding that § 1721(g)(1) preempted Ohio law that would permit rescission of mortgages included in GNMA programs); *NBD Bank*, 922 F. Supp. at 1247 (holding that § 1721(g)(1) preempted Michigan law that could be read to impose on GNMA certain notice requirements before suing under certain mortgages). Federal statutory law therefore preempts any state law purporting to restrict GNMA's extinguishment rights. TCB's state law claim for tortious interference with property rights fails on that basis, by itself.

> **C.    GNMA's Statutory And Contractual Authority To Extinguish Defeats TCB's Tort Claim On The Merits.**

TCB's tortious interference claim also fails on the merits for two reasons: *first,* GNMA's exercise of its extinguishment powers is statutorily authorized and therefore

does not interfere with any property rights actually held by TCB; and *second,* the statutory authority to extinguish constitutes "just cause" or "legal excuse" under Texas law, further disproving TCB's claim. *See Edberg v. Laurel Canyon Ranch Architectural Rev. Comm.*, No. 04-10-00395CV, 2011 WL 541134, at *5 (Tex. App. Feb. 16, 2011). The district court correctly ruled that GNMA's statutory authority to act as it did defeated any state law tortious interference claim, and this Court should affirm the district court's judgment.

Under Texas law, a plaintiff alleging tortious interference with property must show "(1) that an interference with one's property or property rights occurred; (2) such interference was intentional and caused damage; and (3) the interference was conducted with neither just cause nor legal excuse." *Edberg*, 2011 WL 541134, at *5. The first element cannot be proven, because TCB's property rights were entirely derivative of RMF's and at all times remained subject to extinguishment upon RMF's default. *See supra* I.B. Nor can the third element be proven, because GNMA's actions in extinguishing RMF were conducted with just cause and legal excuse: the contractually prescribed and statutorily authorized remedy for RMF's default. *See supra* I.B. Accordingly, TCB's tortious interference count fails on the merits, and the Court should therefore affirm the district court's dismissal of the tortious interference count.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

*Of Counsel:*

DAVID C. WOLL, JR.
*General Counsel*

KIRK MANHARDT
KEVIN VANLANDINGHAM

*Department of Housing and Urban Development*

*s/ Shane Huang*

SHANE HUANG
SAMUEL HOBBS
*Commercial Litigation Branch*
*Civil Division,*
*U.S. Department of Justice*
*P.O. Box 875, Ben Franklin Station*
*Washington, DC 20044-0875*
*(202) 616-0341*
*shane.huang@usdoj.gov*

December 2025

## CERTIFICATE OF SERVICE

I hereby certify that on December 1, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.  Service will be accomplished by the appellate CM/ECF system.

*s/Shane Huang*
Shane Huang, Esq.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 9,916 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/Shane Huang*
Shane Huang, Esq.