# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit
**FILED**
October 9, 2026
Thomas B. Plunkett, III
Clerk

No. 25-10624

Texas Capital Bank,

*Plaintiff—Appellant*,

*versus*

Government National Mortgage Association; United States Department of Housing and Urban Development,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 2:23-cv-156

Before Elrod, *Chief Judge*, Willett and Wilson, *Circuit Judges*.

Cory T. Wilson, *Circuit Judge*:

Under Ginnie Mae's Home Equity Conversion Mortgage-Backed Securities (HMBS) program, mortgage issuers securitize federally insured reverse mortgages while retaining certain interests in the underlying loans, including an interest in subsequent borrower advances known in the industry as "tails." This case concerns what happens to a third-party lender's security interest in mortgage tails when, by operation of contract and federal

law, Ginnie Mae assumes a bankrupt issuer's interests in its underlying securitized mortgages.

Reverse Mortgage Funding, LLC (RMF) participated in the HMBS program. When RMF entered bankruptcy, Texas Capital Bank provided debtor-in-possession financing to RMF, secured by RMF's interests in certain collateral, including its Home Equity Conversion Mortgage (HECM) tails. After RMF defaulted on the guaranty agreement between them, Ginnie Mae, exercising its statutory and contractual authority, eventually extinguished RMF's interests in the underlying mortgages and assumed ownership of the loans.

The parties hotly dispute whether Ginnie Mae's extinguishment of RMF's mortgage interests properly encompassed Texas Capital's lien on RMF's mortgage tails. Ginnie Mae says it did. Texas Capital counters with claims that Ginnie Mae's position violates the Administrative Procedure Act (APA) and Texas tort law. The district court dismissed Texas Capital's promissory estoppel claim, declined to consider its arbitrary and capricious theory, and later dismissed its statutory authority and tortious interference claims via summary judgment. We affirm.

## I.

### A.

This case involves the interaction of two federal housing programs: the HECM program, administered by the Department of Housing and Urban Development (HUD), *see* 12 U.S.C. § 1715z-20(a)(1), and the

HMBS program, administered by the Government National Mortgage Association (Ginnie Mae),[1] *see* 12 U.S.C. § 1716.

The HECM program is a federally insured reverse mortgage program designed to allow elderly homeowners to convert home equity into cash while continuing to live in their homes. Under the program, a lender provides a loan secured by the borrower's home equity, and the Federal Housing Authority (FHA) insures those loans. Under the HMBS program, FHA-approved HECM lenders (or issuers) are then able to pool and securitize their loans via government-backed securities.

A single HECM loan can generate several distinct financial interests over time. When an issuer securitizes a HECM loan, it typically pools part of the loan's principal balance into a HMBS pool, which Ginnie Mae guarantees. The pooled amounts are known as "participations."

HECM loans often accrue additional balances after securitization. Reverse mortgages allow borrowers to draw additional funds against home equity over time, so new advances, interest accruals, insurance premiums, and other charges may increase the mortgage balance after the initial securitization date. These additional amounts are referred to as "tails," and they are unsecuritized. No tail can exist unless an underlying securitized HECM loan precedes it.

---

[1] Ginnie Mae is a government-owned association within HUD. Ginnie Mae guarantees securities backed by federally insured or guaranteed mortgages, with the goal of expanding affordable housing. 12 U.S.C. § 1717(b)(1).

To participate in the HMBS program, issuers execute a guaranty agreement with Ginnie Mae. *See* 12 U.S.C. § 1721(g)(1). The agreement governs the relationship between Ginnie Mae and the issuer, and it defines the parties' respective rights in the underlying mortgage loans.

**B.**

RMF participated in the HMBS program. RMF originated HECM loans and issued securities backed by pools of its loans. Under its guaranty agreement with Ginnie Mae, executed in July 2021, RMF conveyed all title and interest in securitized HECM loans to Ginnie Mae. Ginnie Mae then assigned specific rights and interests back to RMF to allow RMF to service the mortgages. Section 10.04 of the guaranty agreement expressly provides that upon RMF's default, Ginnie Mae could, by letter, "automatically effect and complete the extinguishment of any redemption, equitable, legal, or other right, title, or interest of the Issuer in the Mortgages, the related Ginnie Participations and any Other Interests."

In late 2022, RMF experienced a severe liquidity crisis and filed for Chapter 11 bankruptcy. RMF's bankruptcy constituted an "immediate default" under its guaranty agreement with Ginnie Mae. Despite RMF's default, Ginnie Mae did not immediately extinguish RMF's interests. Instead, Ginnie Mae sought to negotiate a resolution that would allow RMF's mortgage-servicing platform and loan portfolio to be transferred to another market participant.

To continue operations during the bankruptcy proceedings, RMF sought debtor-in-possession (DIP) financing from a third-party lender. Texas Capital ultimately agreed to provide RMF with over $28 million in secured DIP financing. Texas Capital's loan was secured not by the pooled mortgage participations themselves, but by the incremental balances accruing after securitization (i.e., the tails), per the Fifth Amended and

Restated Loan and Security Agreement (the Tail Agreement) between RMF and Texas Capital.[2] The bankruptcy court approved this arrangement, granting Texas Capital "first priority valid, perfected, enforceable and unavoidable liens on, and security interest in, the existing collateral secured under the [Tail Agreement]."

According to Texas Capital, Ginnie Mae originally made verbal assurances that Texas Capital would retain its interest in the DIP collateral (i.e., the tails), even if Ginnie Mae extinguished RMF's interests. Ginnie Mae disputes that it provided such assurances and instead asserts that, in both emails and formal correspondence, it warned Texas Capital that making such a promise would be outside the scope of Ginnie Mae's authority.

Negotiations among RMF, Ginnie Mae, and other stakeholders ultimately failed to yield a feasible transferee for RMF's HECM portfolio. Faced with RMF's continuing default, Ginnie Mae terminated RMF from the HMBS program and extinguished RMF's rights and interests in the mortgages, citing the guaranty agreement. In doing so, Ginnie Mae purported also to extinguish Texas Capital's separate lien interest in the loan tails. This in turn gave rise to the central dispute in this case: whether Ginnie Mae's authority to extinguish RMF's interests in the HECM mortgages also permitted it to eliminate Texas Capital's lien interest in the pledged DIP financing collateral, i.e., the HECM tails.

[2] The Tail Agreement defined a tail as "the aggregate of any additional amounts, including but not limited to amounts created by additional draws by the Obligor, interest accruals, mortgage insurance premiums, fees, or charges, which accrue, are disbursed, or are added to the balance of a previously-securitized HECM Loan after the closing date of any prior securitization of the HECM Loan or any prior HECM Tail related thereto."

### C.

Texas Capital sued Ginnie Mae and HUD (collectively hereafter, Ginnie Mae) in the Northern District of Texas in October 2023. Texas Capital alleged three claims: violation of the APA, promissory estoppel under Texas law, and tortious interference with property under Texas law. Ginnie Mae responded with a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), arguing that Texas Capital's APA claim failed because Ginnie Mae acted within its statutory authority in extinguishing Texas Capital's lien and that sovereign immunity barred Texas Capital's state law claims. Ginnie Mae also asserted that Texas Capital's tortious interference claim failed on the merits because Ginnie Mae had the legal right to take the challenged actions. Opposing the motion, Texas Capital asserted, *inter alia*, that its APA claim encompassed two distinct theories, namely that Ginnie Mae exceeded its statutory authority, and acted arbitrarily and capriciously.

The district court granted Ginnie Mae's motion in part and denied it in part. The court concluded that Texas Capital plausibly alleged that Ginnie Mae lacked statutory authority to extinguish Texas Capital's interest in RMF's loans and likewise determined that the tortious interference claim could proceed. The court declined to construe Texas Capital's complaint as asserting a separate arbitrary-and-capricious APA claim and thus refused to consider that theory.[3] The court also dismissed Texas Capital's promissory estoppel claim as barred by sovereign immunity and improperly pled.

After Ginnie Mae produced its administrative record, Texas Capital moved for summary judgment as to the APA statutory authority claim. The

---

[3] Texas Capital never attempted to amend its complaint in the district court to allege an express arbitrary-and-capricious claim. Nor has Texas Capital attempted to amend its complaint on appeal.

district court denied the motion, instead concluding that Ginnie Mae acted within its statutory authority and that Ginnie Mae's extinguishment of RMF's interests necessarily extinguished any remaining derivative interest that Texas Capital had in the underlying mortgages.

Ginnie Mae then moved for summary judgment "on all remaining claims." The district court obliged, holding that Ginnie Mae acted within its statutory authority and that, as a result, the tortious interference claim failed too.

Texas Capital appealed.

## II.

In this court, Texas Capital renews its contentions that Ginnie Mae (1) exceeded its statutory authority under the APA, (2) tortiously interfered with Texas Capital's property under Texas law, and (3) acted arbitrarily and capriciously under the APA.[4] As for the first two claims, this court reviews *de novo* "a district court's grant of summary judgment and questions of statutory interpretation." *Seago v. O'Malley*, 91 F.4th 386, 389 (5th Cir. 2024) (citation omitted). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

"'[A]gency interpretations of statutes' are reviewed without deference." *Texas v. EPA*, 156 F.4th 523, 536 (5th Cir. 2025) (quoting *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 (2024)). "The interpretation of an unambiguous contract is a matter of law," and "a district court may

[4] Texas Capital's briefing on appeal does not mention the promissory-estoppel theory, so it is forfeited. *See Banks v. Thaler*, 583 F.3d 295, 329 (5th Cir. 2009) ("It is well established . . . that an appellant abandons all issues not raised and properly presented in its initial brief on appeal.").

properly grant summary judgment if a contract is unambiguous[.]" *S. Natural Gas Co. v. Pursue Energy*, 781 F.2d 1079, 1081 (5th Cir. 1986) (citations omitted).

As for the district court's refusal to entertain Texas Capital's arbitrary-and-capricious APA theory, review is *de novo* because that ruling turned on the sufficiency of the pleadings at the Rule 12(b)(6) stage. *See Lampton v. Diaz*, 639 F.3d 223, 225 (5th Cir. 2011) ("We review *de novo* the grant of a Rule 12(b)(6) motion to dismiss." (citation omitted)).

## III.

### A.

The APA commands that courts "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]" 5 U.S.C. § 706(2), (2)(C). When deciding whether an agency has exceeded its statutory authority, courts "exercise independent judgment in determining the meaning of statutory provisions." *Loper Bright*, 603 U.S. at 394. The core inquiry is "whether the agency has stayed within the bounds of its statutory authority." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013) (emphasis omitted). In answering that question, courts "always" begin "with the text" of the governing statute. *Sackett v. EPA*, 598 U.S. 651, 671 (2023) (citation omitted). The plain, "ordinary meaning and structure of the law itself" govern. *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 436 (2019) (citation omitted).

The parties chiefly spar over the meaning of this statutory language:

> [Ginnie Mae] is hereby empowered, in connection with any guaranty under this subsection, . . . to provide by contract with the issuer for the extinguishment, upon default by the issuer, of any redemption, equitable, legal, or other right, title, or interest of the issuer in any mortgage or mortgages constituting the

> trust or pool against which the guaranteed securities are issued; and . . . in the event of default and pursuant otherwise to the terms of the contract, the mortgages that constitute such trust or pool shall become the absolute property of [Ginnie Mae] subject only to the unsatisfied rights of the holders of the securities based on and backed by such trust or pool.

12 U.S.C. § 1721(g)(1). For its part, Texas Capital argues that Ginnie Mae exceeded its authority under § 1721(g)(1) when it purported to extinguish Texas Capital's lien interest in RMF's HECM "tails." Texas Capital reads the statute to authorize Ginnie Mae only to extinguish an issuer's interest in mortgages that are *part of the securitized pool*, and only when that authority is provided by contract with the issuer. Texas Capital contends that Ginnie Mae violated those limits for three independent reasons: (1) Texas Capital's lien was its own property interest —not an "interest of the issuer" (i.e., RMF)—and thus fell outside the statute's scope; (2) the statute requires extinguishment authority to be "provided by contract," yet no such contract existed between Ginnie Mae and Texas Capital; and (3) the loan "tails" were not securitized and were therefore considered outside the HMBS pool, per "uniform industry practice." Texas Capital adds that interpreting the statute to allow Ginnie Mae to destroy its lien interest would raise serious Takings Clause and Due Process concerns, reinforcing that the statute should be read narrowly. Based on Texas Capital's reading of § 1721(g)(1), the district court erred in granting summary judgment to Ginnie Mae on its APA statutory authority claim.

Texas Capital's arguments are unpersuasive. Looking first to its plain text, the statute empowers Ginnie Mae, "by contract *with the issuer*," to extinguish upon default "*any* . . . right, title, or interest of the issuer in any *mortgage or mortgages* constituting the trust or pool against which the guaranteed securities are issued." § 1721(g)(1) (emphasis added). Under the statute, upon default, those mortgages become Ginnie Mae's "*absolute*

*property*," "subject only to the unsatisfied rights of the holders of the securities." *Id.* (emphasis added).

The statute nowhere carves out an exception for loan tails; it refers to "*any* . . . interest of the issuer in . . . *mortgages*." *Id.* (emphasis added). Based on that language, the object of the extinguishment power is the mortgage itself—not discrete subcomponents of securitized mortgages. *Id.* So once a HECM loan is among the mortgages constituting a HMBS pool, Ginnie Mae's extinguishment authority reaches the entire mortgage, including later arising unsecuritized balances (i.e., "tails").

That reading is reinforced by the guaranty agreement and incorporated MBS Guide,[5] which expressly contemplate extinguishment of RMF's interest in the mortgages and related interests: Upon RMF's default, Ginnie Mae was entitled "by letter" "automatically [to] effect and complete the extinguishment of any redemption, equitable, legal, or other right, title, or interest of the Issuer in the Mortgages, the related Ginnie Participations and any Other Interests."

Several other features of the statute and the parties' agreements confirm that Texas Capital's reading is incorrect. First, though Texas Capital emphasizes that its lien was a distinct property interest, its rights remained wholly derivative of RMF's rights in the collateral. After all, RMF could not convey to Texas Capital any greater interest than RMF itself possessed,[6] and Texas Capital's Tail Agreement expressly acknowledged that the pledged collateral remained "subject to the rights and interests of

---

[5] The "Ginnie Mae MBS Guide" is a general, comprehensive publication regarding mortgage-backed securities. *See generally* Ginnie Mae, Mortgage-Backed Securities Guide, Ginnie Mae 5500.3, Rev. 1 (accessible at https://perma.cc/A8YR-QKKR).

[6] *See generally Cockrell v. Texas Gulf Sulphur Co.*, 299 S.W.2d 672, 675 (Tex. 1956).

Ginnie Mae." Second, Congress spoke clearly when it legislated that the mortgages become Ginnie Mae's "*absolute property*" subject "*only*" to security holders' unsatisfied rights. § 1721(g)(1) (emphasis added). The statute does not carve out or even mention existing liens. This strongly cuts against Texas Capital's position that Ginnie Mae assumed the loans subject to Texas Capital's lien.

For all these reasons, there is a sound statutory basis to conclude that Ginnie Mae was empowered to extinguish both RMF's interests and Texas Capital's subordinate interests.

Texas Capital's position that a separate contract between Ginnie Mae and Texas Capital was required to allow extinguishment of Texas Capital's interests in the loan tails is similarly untenable. The statute requires extinguishment authority to be provided "by contract with the issuer." *Id.* That requirement was satisfied via the guaranty agreement between Ginnie Mae and RMF.

Nor can Texas Capital's evidence regarding industry practice save this claim. According to Texas Capital's expert, the reverse mortgage industry often treats pooled participations and unpooled tails as economically distinct units. But the meaning of the statutory text does not turn on how the industry segments cash flows—and the statute dictates Ginnie Mae's extinguishment authority. As the district court explained, Congress chose the term "*mortgage*," not "participation," and courts are not free to rewrite the statute at a finer level of granularity. Memorandum Opinion and Order at 11, *Tex. Cap. Bank v. Gov't Nat'l Mortg. Ass'n* , No. 2:23-cv-156-Z-BR (N.D. Tex. Apr. 2, 2025) (Dkt. 100); *see also* § 1721(g)(1) (emphasis added).

Texas Capital's constitutional-avoidance argument does not alter our conclusion.[7] "The so-called canon of constitutional avoidance is an interpretive tool, counseling that ambiguous statutory language be construed to avoid serious constitutional doubts." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009). The canon "does not supplant traditional modes of statutory interpretation." *Boumediene v. Bush*, 553 U.S. 723, 787 (2008). Rather, it "comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction; and the canon functions as *a means of choosing between them*." *Clark v. Martinez*, 543 U.S. 371, 385 (2005) (emphasis in original). Here, Congress gave Ginnie Mae clear authority to extinguish a defaulting issuer's interests in pooled "mortgages," *see* § 1721(g)(1), not parts or "participations" in such mortgages. Had Congress taken the latter course, the statute might exclude unsecuritized tails—but Congress did not parse so finely. Because the statute is not "susceptible of more than one construction," the constitutional-avoidance canon has no purchase in our analysis. *Clark*, 543 U.S. at 385.

For the foregoing reasons, the district court properly granted summary judgment to Ginnie Mae on Texas Capital's APA statutory authority claim.

---

[7] While Ginnie Mae asserts that Texas Capital failed to preserve its constitutional-avoidance argument in the district court, this is not so. *Cf. Colony Ins. Co. v. Wright*, 16 F.4th 1186, 1189 n.1 (5th Cir. 2021) ("[A]rguments not raised before the district court are waived and cannot be raised for the first time on appeal."). Texas Capital raised this issue in opposing Ginnie Mae's motion to dismiss. Regardless, the constitutional-avoidance canon "is an interpretive tool" that a court can consider when construing a statute. *Zummer v. Sallet*, 37 F.4th 996, 1009 (5th Cir. 2022). Either way, the point is properly before us.

**B.**

Under Texas law, intentional interference with property rights is an actionable tort if it causes injury and lacks just cause or legal excuse. *Suprise v. DeKock*, 84 S.W.3d 378, 380 (Tex. App.—Corpus Christi 2002, no pet.) (quoting *King v. Acker*, 725 S.W.2d 750, 754 (Tex. App.—Houston [1st Dist.] 1987, no pet.)) ("Texas law is well settled that '[a]ny intentional invasion of, or interference with, property, property rights, personal rights or personal liberties causing injury without just cause or excuse is an actionable tort.'"). "[T]he elements of this cause of action are: (1) that an interference with one's property or property rights occurred; (2) such interference was intentional and caused damage; and (3) the interference was conducted with neither just cause nor legal excuse." *Edberg v. Laurel Canyon Ranch Architectural Rev. Comm.*, No. 04-10-00395CV, 2011 WL 541134, at *5 (Tex. App.—San Antonio Feb. 16, 2011, pet. denied) (citations omitted).

Texas Capital maintains that a reasonable jury could find that Ginnie Mae intentionally interfered with its property rights by extinguishing Texas Capital's lien, thereby depriving Texas Capital of the use and value of its collateral. Ginne Mae counters that Texas Capital's tortious interference claim is barred by sovereign immunity and preemption, and it also fails on the merits.

Our analysis begins and ends with sovereign immunity, which "implicates a federal court's subject matter jurisdiction." *Joiner v. United States*, 955 F.3d 399, 403 (5th Cir. 2020). The Federal Tort Claims Act preserves immunity for claims arising out of interference with contract rights. This is the substance of Texas Capital's claim because it ultimately rests on alleged interference with Texas Capital's contractual payment rather than any freestanding property right. 28 U.S.C. § 2680(h); *see also Cascabel Cattle Co., L.L.C. v. United States*, 955 F.3d 445, 450 (5th Cir. 2020) (quotation

omitted) ("A waiver of the Government's sovereign immunity is typically construed, in terms of its scope, in favor of the sovereign."). The district court's summary judgment for Ginnie Mae was therefore proper.

### C.

Texas Capital last argues that the district court erred in refusing to consider its arbitrary-and-capricious theory in the context of its APA claim. According to Texas Capital, it properly alleged the theory because the federal pleading rules require only that a complaint provide the factual basis for a claim, not that it expressly allege every legal theory. Texas Capital asserts that its complaint invoked 5 U.S.C. § 706(2) and alleged key facts that show Ginnie Mae's arbitrariness. In Texas Capital's view, those allegations plausibly state an arbitrary-and-capricious claim, and its brief in opposition to Ginnie Mae's motion to dismiss merely developed the legal theory based on already-pled facts.

Ginnie Mae counters that Texas Capital forfeited any arbitrary-and-capricious APA claim. Ginnie Mae points out that Texas Capital's complaint alleged only that Ginnie Mae acted "not in accordance with law" and "contrary to constitutional right" in contravention of the APA—specifically omitting any reference to "arbitrary and capricious" anywhere in its complaint.

We agree that the district court did not err in refusing to consider Texas Capital's arbitrary-and-capricious theory. This is not a case of an inartfully worded claim or imperfect citation. Texas Capital affirmatively pled an APA statutory-authority theory while *conspicuously omitting* "arbitrary and capricious" from anywhere in its complaint, even when quoting § 706(2):

> 88. The APA provides that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions

> found to be . . . not in accordance with law" or "contrary to constitutional right." 5 U.S.C. § 706(2)(A)–(B).

The second ellipses in this excerpted paragraph is where Texas Capital's arbitrary and capricious theory would otherwise naturally have been rooted; instead, the very theory Texas Capital now seeks to resuscitate was intentionally dropped from the complaint's allegations.

That omission matters. The APA "call[s] for courts to *separately* evaluate whether an agency action is arbitrary and capricious and whether an agency action is in excess of statutory authority." *Brackeen v. Haaland*, 994 F.3d 249, 355 (5th Cir. 2021), *aff'd in part, vacated in part, rev'd in part*, 599 U.S. 255 (2023). And this court has found "no fault with [a] district court's refusal to consider theories not pled." *Glover v. City of Dallas*, 221 F. App'x 311, 314 (5th Cir. 2007). This makes sense considering "[t]he function of a complaint is to give the defendant fair notice of the plaintiff's claim and the grounds upon which the plaintiff relies." *St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 434 (5th Cir. 2000). It is hardly "fair notice" to excise "arbitrary and capricious" from the complaint's quotation of § 706(2) but expect Ginnie Mae to anticipate a claim based on that theory despite Texas Capital's deliberate omission of it.

Nor can Texas Capital substantiate its arbitrary-and-capricious theory with its allegations in support of its promissory estoppel or tortious interference claims. Those claims arise from different sources of law, require different elements, and seek to establish different types of wrongful actions. Simply put, a plaintiff cannot intentionally leave a theory out of its complaint and then try to smuggle it into the case through an opposition brief. *See, e.g.*, *Dorsey*, 540 F.3d at 340; *see also Energy Coal v. CITGO Petroleum Corp.*, 836 F.3d 457, 462 n.4 (5th Cir. 2016) ("[T]he complaint may not be amended by the briefs in opposition to a motion to dismiss.").

Beyond all this, Texas Capital was squarely on notice of the defect in its complaint once the district court refused to consider its arbitrary-and-capricious theory at the motion to dismiss stage. Yet Texas Capital never tried to amend its complaint, even though the Federal Rules of Civil Procedure provided the roadmap to do so. *See* FED. R. CIV. P. 15. Texas Capital made a deliberate pleading decision, to its detriment—and it is too late now for a do-over.

Even liberal pleading rules reach their limit. Here, Texas Capital conspicuously omitted any arbitrary-and-capricious theory from its complaint and inexplicably persisted in litigating as though it had been pled, even after the district court found it to be lacking. Given that deliberate course of conduct, we decline to second guess the district court and treat the omission of this distinct APA theory as immaterial.

## IV.

Ginnie Mae acted within its statutory (and contractual) authority under 12 U.S.C. § 1721(g)(1) when it extinguished RMF's interests in its pool of securitized HECM loans. That extinguishment necessarily eliminated the derivative collateral interests Texas Capital had in RMF's mortgage tails.

Texas Capital's tortious inference claim is barred by sovereign immunity. And because Texas Capital did not plead a distinct APA arbitrary-and-capricious theory in its complaint, the district court properly refused to consider that theory when Texas Capital raised it for the first time in opposition to the motion to dismiss.

Based on the foregoing, the judgment of the district court is

AFFIRMED.